13

1  MONICA Y. KIM (SBN 180139)
   KURT RAMLO (SBN 166856)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
3  Los Angeles, CA 90067
   Telephone: (310) 229-1234
4  Facsimile:  (310) 229-1244
   Email: myk@lnbyb.com; kr@lnbyb.com
5
   Attorneys for Defendant University of Southern California
6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10                         **SACRAMENTO DIVISION**

11 | In re                                  | Case No. 13-27626-C-7
12 |                                        | Chapter 7
   | CHARLES MICHAEL ANKRIM, AND            |
13 | CLAUDIA LYNN ANKRIM,                   | Adv. No. 15-02107-C
14 |                    Debtors.            | DC No. LNB-1
15 | _____       | **DEFENDANT'S REPLY TO**
   | GEOFFREY RICHARDS,                     | **OPPOSITION TO MOTION TO**
16 | CHAPTER 7 TRUSTEE,                     | **DISMISS COMPLAINT TO AVOID**
   |                                        | **AND RECOVER FRAUDLENT**
17 |                    Plaintiff,          | **TRANSFERS**
18 | v.                                     | Date:   September 8, 2015
                                            | Time:   9:30 a.m.
19 | UNIVERSITY OF SOUTHERN                 | Courtroom:  Courtroom 35
20 | CALIFORNIA,                            |             Department C
                                            |             501 I Street, 6th Floor
21 |                    Defendant.          |             Sacramento, CA
22 |                                        |
                                            | [Request for Judicial Notice Filed
23 |                                        | Concurrently Herewith]

24

25

26

27

28

**TO THE HONORABLE CHRISTOPHER M. KLEIN, UNITED STATES BANKRUPTCY JUDGE:**

Defendant University of Southern California ("USC" or "Defendant") hereby submits its reply ("Reply") to the opposition ("Opposition") filed by Geoffrey Richards, the Chapter 7 trustee ("Trustee" or "Plaintiff") of the bankruptcy estate of the above-referenced debtors, Charles Michael Ankrim and Claudia Lynn Ankrim ("Debtors"), to USC's motion ("Motion") to dismiss the "*Complaint To Avoid and Recover Fraudulent Transfers*" ("Complaint") brought by the Trustee. All capitalized terms used herein shall have the meanings given in the Motion unless otherwise stated. In support of its Reply, USC respectfully represents as follows:

## I.

### This Court Should Decide, As A Matter Of Law, That The Complaint Fails To State A Claim Upon Which Relief Can Be Granted

Unjustifiably, the Trustee argues that USC is ignoring binding authority and "instead urges the Court to prematurely cut off development of legal theories at issue in this case despite the fact that it may well be a case of first impression in the Ninth Circuit." See Opposition, Page 4, Lines 15-17. But, clearly, there is no binding authority on the issue of whether the Debtors received reasonably equivalent value for the Payments, and USC brought the Motion purposefully and as expeditiously as possible to allow for the Court's immediate consideration of the novel claims brought by the Trustee in his Complaint. USC is not seeking to cut off "development of legal theories"; the Trustee has already advanced his legal theories which USC does not believe constitute claims upon which relief can be granted. Therefore, by the Motion, USC is promptly seeking the Court's intervention.

The Trustee also argues that this Court is bound by Ninth Circuit Bankruptcy Appellate Panel ("BAP") and Ninth Circuit Court of Appeals cases which have applied the "indirect benefit" standard in contexts that are "analogous," but unrelated in any way to educational expenses, such as the case of In re Kelsey ("Kelsey"). See Opposition, Page 9, Lines 14-17. However, Kelsey was neither a case out of the Ninth Circuit BAP nor the Ninth Circuit Court of Appeals! Rather, Kelsey was a case decided by the Tenth Circuit BAP (the correct citation

1

is 270 B.R. 776 (B.A.P. 10th Cir. 2001)).  Therefore, Kelsey is not binding as the Trustee argues.

Moreover, the facts of the actual Ninth Circuit BAP and Court of Appeals cases cited to by the Trustee (In re Pringle, 495 B.R. 447 (B.A.P. 9th Cir. 2013); In re Northern Merch., Inc., 371 F.3d 1056 (9th Cir. 2004)) are, by the Trustee's own admission, distinguishable because the transfers implicated in those cases were not for the benefit of the debtor's children or for educational expenses.  In re Pringle involved a transfer of a house from the debtor to his long-time girlfriend. 495 B.R. 447 (B.A.P. 9th Cir. 2013).  Northern Merchandise involved a security interest given by the debtor to a lender, Frontier Bank.  372 F.3d 1056 (9th Cir. 2004). Notably, although the facts are distinguishable, the Ninth Circuit actually adopted the "indirect benefit" rule for purposes of section 548 in the Northern Merchandise case.  "It is well settled that reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule".  In re Northern Merch., Inc., 372 F.3d at 1058.  In adopting this "indirect benefit" rule, the Ninth Circuit relied on Rubins v. Manufacturers Hanover Trust Co., 661 F.2d 979, 991-92 (2d Cir. 1981), wherein the court explained:

> a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person … although transfers solely for the benefit of third parties do not furnish fair consideration… the transaction's benefit to the debtor need not be direct; it may come indirectly through benefit to a third person…. If the consideration given to the third person has ultimately landed in the debtor's hands, or if the giving of the consideration to the third person otherwise confers an economic benefit upon the debtor, then the debtor's net worth has been preserved, and [the statute] has been satisfied – provided, of course, that the value of the benefit received by the debtor approximates the value of the property or obligation he has given up.

See also In re Pajaro Dunes Rental Agency, Inc., 174 B.R. 557, 579 (Bankr. N.D. Cal. 1994) (… general rule … that benefits, consideration for transfers, could accrue to a debtor through

indirect, third-party routes, not just in a direct exchange with the challenged transferee."). Here, although the Debtors were not the direct recipients of the education provided by USC, the Debtors nonetheless received tremendous benefit from the education provided by USC to their children.

As discussed in the Motion, the Trustee cannot establish that the Debtors, as parents, did not receive reasonably equivalent value, directly or indirectly, for the Payments. While the PACT Act is pending, the intent and purpose of the proposed amendments to section 548 are not to change a long-standing or established course of action by bankruptcy courts and chapter 7 trustees to allow for the recovery of pre-petition educational expenses paid for by debtor parents for their adult children as the Trustee infers. Rather, the proposed legislation is to protect "students, parents, and colleges against a troubling new practice by bankruptcy trustees targeting tuition payments parents have made on their children's behalf." Congressman Chris Collins, one of the proponents of the PACT Act bill, issued a press release on May 13, 2015 regarding the bill as follows:

> Congressmen Chris Collins (NY-27) and Blake Farenthold (TX-27) today released the following statements after introducing the Protecting All College Tuition Act (PACT Act). The PACT Act protects students, parents, and colleges against a troubling new practice by bankruptcy trustees targeting tuition payments parents have made on their children's behalf.
>
> "Higher education is one of the best ways to guarantee a child's future success," said **Congressman Collins**. "We made a pact to provide our children with the tools to succeed. As a parent, I wake up every morning thinking about how I can make my child's future better, and I believe that feeling is shared by a majority of parents. The PACT Act will ensure that the financial sacrifices parents made to pay their children's tuition are protected from seizure in bankruptcy proceedings."
>
> "The thought that if I had a financial hardship it could retroactively endanger my daughters' educations and their future is shocking and just plain wrong," said

3

> **Congressman Farenthold**. "The new practice of bankruptcy collectors suing colleges for tuition already paid is inappropriate and we need to take action to stop it before more struggling parents lose what matters most to them – the wellbeing of their kids. This bill provides a simple fix to the problem by clarifying that tuition paid isn't some kind of fraudulent transfer, or of dubious value, but a real investment in the future of our children and our nation."
>
> The issue was recently highlighted in a Wall Street Journal article, showing the growing trend of bankruptcy trustees collecting debts of parents by targeting the investments they have made in their children's education. To combat this growing problem, Congressman Collins introduced this legislation. The PACT Act will establish that college tuition payments qualify under the "reasonably equivalent value" bankruptcy standard, exempting tuition payments from questionable bankruptcy practices.

While not law, USC believes that the proposed bill and the reasons behind the proposed bill should be considered by the Court in its review of the Motion.

The Trustee's focus on the ages of the Debtors' children and whether the Debtors had any legal obligation under state law to pay for their college educational expenses is also misguided and seriously conflicts with federal and California public policy and the reality of today's cultural and societal expectations of families. Federal law expresses its public policy in many places. For example, the Patient Protection and Affordable Care Act (the "Affordable Care Act") provides that medical insurers must provide coverage to the adult children of their insureds or beneficiaries. Affordable Care Act § 1001(1), 42 U.S. Code § 300gg–14(a). The Health Care and Education Reconciliation Act of 2010 (the "Reconciliation Act") provides that any amounts received for personal injuries or sickness under employer provided health or accident insurance is gross income to the taxpayer employee except if those amounts are reimbursement expenses incurred by the taxpayer for the medical care of "any child (as defined in section 152(f)(1)) of the taxpayer who as of the end of the taxable year has not attained age

4

27." Reconciliation Act § 1004(d)(1), 26 U.S.C. § 105(a)-(b). Self-employed taxpayers can deduct the medical care provided to their adult children through age 26. Reconciliation Act § 1004(d)(1), 26 U.S.C. § 162(l). The Working Families Tax Relief Act of 2004 amended the Internal Revenue Code to permit taxpayers to claim their adult children through age 23 as dependents if they are students. See Working Family Tax Relief Act § 201, 26 U.S.C. 152(a)(1), (c)(3), (f)(1). The Credit Card Accountability Responsibility and Disclosure Act of 2009, also known as "Credit CARD Act of 2009" prohibits the issuance of a credit card to a consumer under the age of 21 unless the application includes (a) co-signer including the parent, legal guardian, spouse, or any other individual who is at least 21 having a means to repay debts incurred by the consumer, or (b) financial information indicating that the consumer has an independent means of repaying the obligation. 15 U.S.C. § 1637. There are also restrictions to increasing the credit lines for credit cards held by consumers under 21 on an account for which a parent, legal guardian, spouse or any other individual who is at least 21 is jointly liable.

In 2005, the Bankruptcy Code was amended to exclude certain funds in post-secondary education individual retirement accounts and certain tuition creditors or certificates. 11 U.S.C. § 541(b)(5)-(6). And chapter 13 debtors can make some payments toward an adult child's tuition to the extent "reasonably necessary to be expended for the maintenance or support of the debtor or **dependent** of the debtor" (and for above-median debtors, if consistent with 11 U.S.C. § 707(b)(2)). 11 U.S.C. § 1325(b)(2)(A)(i), (3) (emphasis added).

California also expresses these same policies. For example, in 2011, California amended its definition of gross income to parallel the newly amended 26 U.S.C. § 105(b), see Cal. Rev. & Tax. Code section 17131.7, permitted self-employed taxpayers to deduct medical insurance for adult children through age 26, see Cal. Rev. & Tax. Code section 17201.1, and excluded from "wages" those amounts excluded from gross income under 26 U.S.C. § 105(b) for insurance reimbursement for adult children who are full-time students through age 26, see Cal. Unemp. Ins. Code section 938.4. California uses the same definition of dependent as federal law, allowing an exemption for each adult student child through age 23. See Cal. Rev. & Tax. Code section 17056. California family law also takes into account one parent's

financial support for a child's post-secondary education when adjudicating spousal support. See Marriage of Epstein, 24 Cal. 3d 76, 90, 154 Cal. Rptr. 413, 422 (1979); Marriage of Paul, 173 Cal. App.3d 913, 920, 219 Cal. Rptr. 318, 321-22 (1985); cf. Marriage of Serna, 85 Cal. App. 4th 482, 487-88, 102 Cal. Rptr. 2d 188, 191-92 (criticizing Paul for construing Epstein as authority for issue not considered).

These federal and California laws encourage and incentivize parents and guardians to support their adult children students during their post-secondary education. Although California law does not mandate that parents and guardians to do so, see Jones v. Jones, 179 Cal. App. 3d 1011, 1013-17, 225 Cal. Rptr. 95, 96-99 (1986), and bankruptcy law places limitations on chapter 13 debtors who continue doing so postpetition, both federal and California law nevertheless recognize that students are dependent on and dependents of their parents or guardians for post-secondary education. Both provide various benefits and incentives to parents who assume the "societal expectation that parents will assist with such [post-secondary education] expense if they are able to do so." See Shearer v. Oberdick (In re Oberdick), 490 B.R. 687, 712 (Bankr. W.D. Pa. 2013). Both recognize that the family with college students continues to function "as a single economic unit." See Geltzer v. Xaverian High School (In re Akanmu), 502 B.R. 124, 137-38 (Bankr. E.D.N.Y. 2013). As a result, such a family should be reviewed as a single economic unit for voidable transaction purposes.

Notwithstanding these federal and California policies, the Trustee points to In re Leonard, 454 B.R. 444 (Bankr. E.D. Mich. 2011), and In re Lindsay, 2010 Bankr. LEXIS 1554 (Bankr. S.D.N.Y. May 4, 2010) for the proposition that debtor parents do not and could not derive reasonably equivalent value from educational expenses paid for their adult children because there was never any legal obligation to pay for such expenses. This rationale is extremely flawed, however, because pre-petition transfers are not per se avoidable and recoverable on the basis that the debtor had no legal obligation to make the transfers. Section 548 is not drafted to allow for the avoidance and recovery of every transfer which is not based on a legal obligation. Furthermore, as is the case with virtually all families today, the process of determining how to pay for college tuition and related expenses is not one undertaken

by the child alone who typically would not have the financial wherewithal to pay for college tuition and related expenses alone, but rather, the family as one economic unit. Applications for any form of financial assistance to attend a college that participates in federal student financial assistance programs require and consider information about the financial condition of the dependent child and the child's parents (i.e., one economic unit) in determining the range, types and packages of grants, aid and loans that the student could qualify for and obtain. See 34 C.F.R. § 668.1(a) ("This part establishes general rules that apply to an institution that participates in any student financial assistance program authorized by Title IV of the Higher Education Act of 1965, as amended"); 34 C.F.R. § 668.2(b) ("The following definitions apply to all Title IV, HEA programs: . . . *Expected family contribution (EFC):* The amount, as determined under title IV, part F of the HEA, an applicant and his or her spouse and family are expected to contribute toward the applicant's cost of attendance."); 20 U.S.C. § 1087mm(a) ("the term "family contribution" with respect to any student means the amount which the student and the student's family may be reasonably expected to contribute toward the student's postsecondary education for the academic year for which the determination is made, as determined in accordance with this part."); 20 U.S.C. § 1087oo(a) ("(a) Computation of expected family contribution [¶] For each dependent student, the expected family contribution is equal to the sum of—(1) the parents' contribution from adjusted available income (determined in accordance with subsection (b) of this section); (2) the student contribution from available income (determined in accordance with subsection (g) of this section); and (3) the student contribution from assets (determined in accordance with subsection (h) of this section)."). The U.S. Department of Education also maintains a website devoted to federal student loans (www.studentaid.ed.gov). In describing how much money an applicant might get, the website explains that the "eligibility depends on your **Expected Family Contribution**, your year in school, your enrollment status, and the cost of attendance at the school you will be attending." (emphasis added). "Expected Family Contribution" (otherwise known as EFC) is described as being "…calculated according to a formula established by law. Your family's taxed and untaxed income, assets, and benefits (such as unemployment or Social Security) all

7

could be considered in the formula. Also considered are your family size and the number of family members who will attend college or career school during the year." See Exhibit 1 attached to the Request for Judicial Notice filed concurrently herewith. California also requires an expected family contribution for financial aid. Cal. Educ. Code § 69503(a) ("The awarding of financial assistance to needy students by state-funded student aid programs appropriately considers family income in determining an applicant's financial need."); Cal. Educ. Code § 69506(a) ("The methodology set forth in federal law or regulation shall serve as the formula for determining the expected family contribution of students seeking any state-funded financial assistance.").

As a result, universities across the country and the federal government treat dependent college students as one economic unit. After USC has provided its educational services for the benefit of the Debtors' family and the Debtors have filed chapter 7 (for reasons unspecified in the Complaint), the Trustee suggests that the Court must view the Debtors' children as having been financially independent of, and completely separate from, their parents at the time when they chose to accept entry into USC and to continue their education there. But, this is neither today's reality nor the facts that existed at the time the Debtors' children attended USC. Therefore, even though the Debtors' children may not have been minors at the time of the Payments, the Court cannot ignore the reality that the Debtors and their children viewed the Payments as a family obligation when they decided to attend and pay for USC.

Moreover, parents who fund college tuition and related expenses for their adult children stand to receive benefit, directly and indirectly, as well as economically and non-economically, in much greater and broader ways than parents who must pay for pre-college educational expenses for their minor children. College education, more than pre-collegiate education, enables a greater opportunity and likelihood for well paying jobs and careers. In turn, gaining employment and a professional future alleviates parents from the financial burdens of having to support their children during their adulthood. It also allows for the adult children to contribute to the livelihood of their parents if necessary. These are direct economic benefits that parents derive from providing a college education for their children. It also goes without saying that

8

the non-economic benefits are enormous, such as parents being fulfilled in their personal goals of having provided a college education and related experiences for their kids, and thereby establishing the strongest foundation possible for starting their own adult lives as USC believes the Debtors' children have done.

If the Complaint is not dismissed, USC will, in addition to defending the Complaint, be left with no choice other than to seek to recover all Payments from Cody and Courtney Ankrim.  Should this occur, it is likely that the children will look to their parents for financial help to pay for legal costs and possible judgment.  This eventual scenario whereby the Debtors are likely to suffer financial harm should the Complaint continue to proceed demonstrates that the Debtors have indeed received reasonably equivalent value for the Payments.

The legal theory advanced by the Trustee (and other trustees) are without merit, flawed, and contrary to public policy of promoting parents to support the higher education of children. Therefore, the Complaint must be dismissed.

## II.

### The Skeletal Facts Contained In The Complaint Are Not Sufficient
### To Plead The Alleged Claims

The key facts alleged in the Complaint boil down to 8 statements contained in Paragraphs 7 to 14 of the Complaint and an exhibit listing the Payments, which collectively do not give USC sufficient notice as to the section 548 claims made by the Trustee.  The remainder of the Complaint is mere recitation of the statutory language and contains no facts to support the section 548 claims.

There are 116 Payments at issue.  USC is given an exhibit listing dates, payee and amount, but nothing more.   There are 6 different payees on the exhibit:

USC Cashier's Offices

USC Bookstore

USC Ticket Office

USC Student Financial Services

USC The Lab

9

USC Card Services

There are no facts as to the purpose, description or nature of the Payments, and who the Payments were made for and why.

In any given year, USC is home to approximately 45,000 undergraduate and graduate students, approximately 20,000 professors, administrative staff and employees, and tens of thousands of patients. USC has a large number of schools, departments, and units, including medical centers and the Keck hospital, all of which engage in a huge number of transactions on a daily basis. Without facts as to the Payments, the Trustee is essentially placing USC in the position of having to undergo very time consuming, costly and prejudicial discovery to uncover the nature of every one of the 116 Payments, and transferring to USC the Trustee's burden to establish all elements of section 548.

Moreover, there are no facts alleged at all as to the insolvency of the Debtors, despite that the Trustee seeks to avoid and recover 116 Payments spanning 4 years of time. With regard to the Debtors, "insolvent" means the financial condition such that the sum of the Debtors' debts is greater than all of the Debtors' property, at a fair valuation, exclusive of (i) property transferred, concealed, removed with intent to hinder, delay, or defraud the Debtors' creditors; and (ii) property that may be exempted from property of the estate under section 522 of this title. 11 U.S.C. § 101(32). There is no information as to the financial condition of the Debtors during the relevant time frame. See Hoffman v. Abelman (In re SCI Real Estate Invs., LLC), No. 2:13-ap-01175-PC, 2013 WL 1829648, at *6 (Bankr. C.D. Cal. May 1, 2013) (dismissing complaint which did not state facts to show that debtors were actually insolvent, listing specific facts which were missing). The Complaint is devoid of any facts as to the income, expenses, assets, or liabilities of the Debtors or the value of the Debtors' assets upon which the legal conclusion is made by the Trustee that the Debtors were insolvent during the 4 year period prior to the Debtors' bankruptcy. Therefore, USC is given no notice as to an essential element of the Trustee's claims against USC, and again would be unfairly and unreasonably forced to undergo time consuming, costly and prejudicial discovery to uncover facts on an element, the burden of proof on which falls on the Trustee. The Trustee should

have stated in the Complaint facts which lead him to believe that the Debtors were insolvent during the 4 year period prior to the Debtors' case. Without such basic facts, the Trustee is negligently leading the parties and the Court through a time consuming and expensive litigation process. Given the magnitude of the Payments at stake and the expansive time period at issue, facts that are condensed into 8 sentences and an exhibit hardly constitutes sufficient facts to properly plead the Trustee's section 548 claims. The Complaint does not meet the Twombly standard, and therefore, must be dismissed.

### III.

### Claims For Relief 1 And 6 Must Be Dismissed

In In re Bellardita, 2008 WL 4296554 (Bankr. E.D. Cal), Bankruptcy Judge Whitney Rimel for the Eastern District of California ruled that section 548(a)(1)(B)(ii)(II) applies only to business debtors. In so ruling, Judge Rimel cited to 4 NORTON BANKR. L. & PRAC. 3D 67:5 (2008) (Section 548(a)(1)(B)(ii)(II) which states that this section 'is the only ground under Bankruptcy Code § 548 … that is confined solely to business debtors.'). The Collier treatise is consistent. See 5 COLLIER ON BANKRUPTCY ¶ 548.05[3][b], at 548-78 to 548-80 (16th ed. 2015).

USC submits that this is the correct interpretation of section 548(a)(1)(B)(ii)(II) which should be adopted by this Court in this case in lieu of a non-bankruptcy, district court case out of Montana as suggested by the Trustee.

### IV.

### Justice Does Not Require Leave To Amend The Complaint

As the Motion and this Reply argues, the Trustee's Complaint fails to state claims upon which relief can be granted because the Trustee cannot establish that the Debtors did not receive reasonably equivalent value for the Payments. No amendment can cure this problem, and, therefore, leave to amend must be denied.

Moreover, justice does not require that the Trustee be given leave to amend. The Debtors filed their Chapter 7 bankruptcy case on June 3, 2013, and the Complaint was filed on May 29, 2015, almost two years after the filing date. Two years is more than ample time for

the Trustee to investigate the claims against USC, and set forth sufficient facts in his Complaint to support such claims.

Presumably, the Trustee has had access both to the Debtors and to their financial records to shed more facts as to each of the Payments (such as invoices, statements, receipts and the like), and as to the insolvency of the Debtors, and, therefore, the facts as they are alleged in the Complaint reflect the maximum facts currently available to the Trustee to support the claims brought against USC. There is no evidence that the Debtors did not cooperate with the Trustee's investigation of the pre-petition transfers, and, even if cooperation from the Debtors was not forthcoming, the Trustee and his counsel could have obtained information and facts through discovery. There is no evidence to show that the Trustee was impeded in his efforts to properly plead his claims against USC. During the two years prior to filing the Complaint, the Trustee never contacted USC for information. To provide additional time to the Trustee now to further investigate and/or to amend the Complaint would be highly prejudicial to USC and eviscerate the statute of limitations provided for in section 548(a)(1).

Justice is not impeded by denial of leave to amend. The Trustee used almost the full amount of the two years that he was given under law to uncover claims, and to properly plead the elements of such claims. There is no legitimate reason or basis to grant leave to amend.

## V.

## CONCLUSION

For all of the reasons set forth herein and in the Motion, USC respectfully requests that the Court grant the Motion and dismiss the Complaint with prejudice.

Dated:  September 1, 2015                UNIVERSITY OF SOUTHERN CALIFORNIA

By:   */s/ Monica Y. Kim*
     Monica Y. Kim
     Kurt Ramlo
Levene, Neale, Bender, Yoo & Brill L.L.P.
Attorneys for University of Southern California